IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

JIMMY D. BURTON,

     Plaintiff,

  v.                                         No. 1:19-cv-2445-JDB-jay

FOOD GIANT SUPERMARKETS, INC.,

     Defendant.

---

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Before the Court is the motion of Defendant, Food Giant Supermarkets Inc. ("Food Giant"), for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure, on the claims made against it by Plaintiff, Jimmy Burton. (Docket Entry ("D.E.") 33.)

## I.    UNDISPUTED FACTS

A. Background

The following facts are undisputed unless otherwise noted. Burton was hired by Food Giant in July of 2007 as a meat market manager at its grocery store ("Store") located in Lexington, Tennessee. (D.E. 46-1 at PageID 578.) Food Giant is an entity covered by the Food Safety Modernization Act ("FSMA"). (D.E. 45-1 at PageID 537; D.E. 46-1 at PageID 578.)

Burton was the on-site manager responsible for all operations in the meat department, which contained a processing room and a retail area. (D.E. 45-2 at PageID 550.) The meat department processed raw meat for sale to the public. (D.E. 45-2 at PageID 550.) On various occasions from 2012-2016, Burton made complaints about condensation that dripped into the meat department from the ceiling. (D.E. 45-2 at PageID 552.) He voiced such concerns to his immediate

1

supervisor, Joel Scott, as well as Gary Gilley, who was Scott's supervising manager and the Meat and Deli Director for Food Giant. (D.E. 45-2 at PageID 552.)

In response to those complaints, Defendant took actions in an attempt to stop the condensation. (D.E. 45-2 at PageID 552.) Food Giant also conducted employee meetings on the status of its efforts, and at those sessions, it received additional complaints from Burton, as well as other employees, about the issue. (D.E. 45-2 at PageID 552.)

The Tennessee Department of Agriculture ("TDA") automatically inspects the Store every three months and whenever specific complaints are filed. (D.E. 45-2 at PageID 550-51.) When inspections occurred, Burton routinely interacted with two inspectors from the TDA and complained to both of them about the problem in the meat department. (D.E. 45-2 at PageID 550-51.) Randall Hanken, an inspector for the TDA who was involved in the occurrence at the center of this lawsuit, was one of those inspectors. (D.E. 45-2 at PageID 550-51.) In fact, Burton and Hanken interacted with each other on six previous occasions without incident. (D.E. 46-1 at PageID 593.)

B.  Event on August 26, 2016

On that day, Hanken came to the Store to investigate a complaint about contamination of meat due to dripping condensation in the processing room. (D.E. 45-2 at PageID 553.) Burton knew a complaint had been filed with the TDA and that an inspector would be in the Store that day. (D.E. 45-2 at PageID 553.)

The events in the meat department involving Burton and Hanken were captured on video but without any audio. (D.E. 45-2 at PageID 553-54.) Rick Moody, the manager of the Store, was present and witnessed most of Plaintiff's interactions with the inspector and provided testimony at the unemployment hearings. (D.E. 31-1 at PageID 162.) Moreover, two other employees—Brittain

Price and Larry Rhodes—were present for most of the incident and provided written statements. (D.E. 45-2 at PageID 554, 561.)

When Hanken and the store manager entered the meat department, Burton was stacking raw meat patties on a table, placing them onto plastic trays, and then putting the trays on a cart for another employee to wrap with plastic. (D.E. 45-2 at PageID 554.) The inspector noticed two drips falling from the ceiling. (D.E. 45-2 at PageID 554-55.)  According to Hanken, one of the beads did not land on the meat but the other did in front of Plaintiff. (D.E. 45-2 at PageID 554-55.) Hanken showed Burton, by pointing with a flashlight, that condensation was dripping directly onto the meat in sight of him and told him to move the patties. (D.E. 45-2 at PageID 554-556.) Burton admitted in his testimony that he knew of one water drip falling from the ceiling on that day. (D.E. 33-4 at PageID 304-305.) However, he maintained that he was not aware of any other droplets landing on the meat. (D.E. 33-4 at PageID 304-305.)

Without moving the patties, Burton grabbed a nearby broom, and according to his testimony, "punch[ed]" the ceiling tiles with the handle. (D.E. 33-4 at PageID 307.) Plaintiff testified that as he hit the tiles, water "pour[ed] out like you took a bucket and poured it out." (D.E. 33-4 at PageID 307.) As the result of Plaintiff's actions, water spilled onto the raw patties, and the inspector identified Burton as the cause of the contamination. (D.E. 45-2 at PageID 556, 560.) The two then exchanged words. (D.E. 45-2 at PageID 554-58.) Although witnesses have testified and/or provided written statements about what occurred, there is some disagreement by the parties as to what was said, and the intention of the words expressed.

Hanken related that when he told Burton to move the patties and perform his work elsewhere, Plaintiff became angry and yelled at him. (D.E. 33-11 at PageID 141-44.) The Plaintiff stated that he did not yell at the inspector but did admit that he "raised his voice." (D.E. 33-4 at

3

PageID 334.) Burton conceded that there is a close similarity between yelling and raising your voice. (D.E. 33-4 at PageID 334.)

It is uncontroverted that Plaintiff told Hanken that because of the inspector's incompetence, two employees had lost their jobs and Burton "had enough[.]" (D.E. 45-2 at PageID 557.) Hanken responded that Plaintiff was not listening to him and that he would "shut this meat department down." (D.E. 45-2 at PageID 557.) Burton heard Hanken also say to Moody that "I'm not going to put up with his damn mouth[.]" (D.E. 33-4 at PageID 308.) However, Price stated in his written statement that he heard the inspector say to Moody that "I don't have to listen to this damn guy. I will shut it down!" (D.E. 31-2 at PageID 228.) Hanken testified that he did state that he was planning to close the meat department but denied saying he would disregard what Plaintiff said. (D.E. 31-11 at PageID 149-153)  According to Burton, at some point in this exchange, Hanken told Plaintiff to "get out of his face " (D.E. 45-2 at PageID 557.)

As shown on the video, after this argument, Hanken backed up from Burton and left the processing room with Moody. (D.E. 45-2 at PageID 557.) Burton then followed the two, and at that point, which is not captured on video, Hanken recalled that Plaintiff "burst" out of the processing room into the store. (D.E. 31-1 at PageID 141.) He then approached to within three feet of the inspector, pointed his finger, and yelled "you have not heard the last of this" and you "had better take heed." (D.E. 31-1 at PageID 147.) In his testimony, Burton admitted to following Hanken and making these statements to him. (D.E. 33-4 at PageID 310-11.)

Hanken asked Plaintiff if he was threatening him, but Hanken heard no response. (D.E. 33-11 at PageID 471.) The inspector repeated his question, and Plaintiff replied, "[n]o sir, I'm not[;] I am just telling you the truth." (D.E. 45-2 at PageID 558.)

Hanken told Moody that he believed Burton had threatened him. (D.E. 45-2 at PageID 559.) He also related that Plaintiff was "aggressive[]" and that the statements he made were "threatening." (D.E. 33-11 at PageID 481.) The inspector testified that Plaintiff was enraged and that his yelling was almost to the point of screaming. (D.E. 33-11 at PageID 472.)

Moody recalled that he was "floored" and "in shock" by Burton's conduct. (D.E. 45-2 at PageID 558.) He also related that it was a "threating conversation." (D.E. 31-1 at PageID 178.)

Due to the leaking issues, Hanken closed the meat department and quarantined the meat that was sitting out. (D.E. 45-2 at PageID 559.) Moody reported the events to Scott and informed him that Hanken felt he had been threatened by Burton. (D.E. 45-2 at PageID 559.) Scott came to the Store that day, where the inspector told him what had occurred and that he felt Burton threatened him. (D.E. 45-2 at PageID 559.)

Scott telephoned Peggy Gates, the human resources manager for Food Giant.  (D.E. 45-2 at PageID 560.) After hearing what occurred, Gates instructed Scott to suspend Burton while an investigation was conducted. (D.E. 45-2 at PageID 560.) Scott suspended Burton and advised him that there would be an investigation. (D.E. 45-2 at PageID 560.) As he departed the Store, Plaintiff told Hanken he had been suspended, and said, "I guess you have been looking for this." (D.E. 45-2 at PageID 560.)

Later that day, a conference call occurred between Hanken, Scott, Moody, and the maintenance supervisor for Food Giant, Tony Lackey. (D.E. 45-2 at PageID 560.) During that call, Lackey proposed cleaning the processing room, replacing the ceiling tile, and inserting a foam barrier to alleviate the condensation issues. (D.E. 45-2 at PageID 560.) Based on those changes, TDA approved reopening the meat department the next day. (D.E. 45-2 at PageID 560.) Hanken

filed his report, which indicated Plaintiff had engaged in contamination. (D.E. 45-2 at PageID 560.)

Plaintiff was suspended from August 26 to August 30, 2016.   (D.E. 33-7 at PageID 414.) Gates prepared a discipline record approved by Scott to document the reason for Burton's suspension. (D.E. 45-2 at PageID 560-61.) The report explained that this action was based on the account of inappropriate and threatening behavior by Plaintiff towards Hanken. (D.E. 45-2 at PageID 560-61.)

Following the incident and Plaintiff's suspension, Gates conducted an investigation and determined that Burton should be fired. (D.E. 45-2 at PageID 561.) Gates, Scott, and Moody met with Burton on August 31. (D.E. 45-2 at PageID 561.) Burton made an audio recording of the meeting. (D.E. 29 at PageID 73.) Gates identified the specific threatening and aggressive behavior by Plaintiff towards Hanken and explained that his conduct violated Food Giant's Standard of Conduct Number 8 ("SOC 8"). (D.E. 45-2 at PageID 562.) Because he was a member of management, reasoned Gates, Burton was accountable for his conduct, and thus, she terminated his employment. (D.E. 45-2 at PageID 562.)

C.  Standards of Conduct

Food Giant's Standards of Conduct required that employees observed them and that a violation could lead to discharge. (D.E. 45-2 at PageID 551.) SOC 8 stated that employees cannot "[use] insulting, vulgar, or abusive language, harassing, bullying, intimidating, coercing, assaulting or threatening with physical harm another employee, customer or vendor."  (D.E. 45-2 at PageID 551.) It is undisputed that SOC 8 applied to Hanken while he was at the Store and that Burton knew he was responsible for abiding by it. (D.E. 45-2 at PageID 551.) Plaintiff also was

aware that as a Food Giant representative, he was required to deal respectfully with government personnel. (D.E. 45-2 at PageID 551.)

## II.   PROCEDURAL HISTORY

Plaintiff filed an FSMA retaliation complaint with the United States Occupational Safety and Health Administration ("OSHA") on February 21, 2017. (D.E. 1 at PageID 1.) A written determination dismissing Plaintiff's complaint was issued by OSHA in a letter dated June 13, 2019. (D.E. 1 at PageID 1.) On July 11, 2019, Plaintiff filed a complaint against Defendant alleging that he was discharged in retaliation for making food safety complaints, in violation of the FSMA. (D.E. 1.) On September 3, 2020, Defendant filed its motion for summary judgement to which Plaintiff responded and Defendant replied.

## III.   LEGAL STANDARD

Rule 56 permits the court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "There is no genuine issue for trial where the record 'taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013) (quoting *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The moving party bears the initial burden of establishing that there are no genuine issues of material facts, which it may accomplish 'by demonstrating that the nonmoving party lacks evidence to support an essential element of [his] case.'" *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 851 (6th Cir. 2017) (quoting *Ford v. Gen Motors Corp.*, 305 F.3d 545, 551 (6th Cir. 2002)).

"The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party." *Jones v. City of*

*Franklin*, 677 F. App'x 279, 282 (6th Cir. 2017) (citing *Banks v. Wolfe Cty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003)). "[C]onclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment." *Id.* (citing *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). Thus, "in order to defeat summary judgment, the party opposing the motion must present affirmative evidence to support [his] position; a mere 'scintilla of evidence' is insufficient." *Id.* (quoting *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003)). In making a determination on a Rule 56 motion, the court is to "view all evidence in the light most favorable to the nonmoving party." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) (citing *Matsushita*, 475 U.S. at 587)).

## IV.    ANALYSIS

The FSMA contains a whistleblower provision that protects workers employed at food companies from being fired if they complain to their employers or government officials about any act or omission they reasonably believe violates the Federal Food, Drug, and Cosmetic Act ("FFDCA"). *See* 21 U.S.C. § 399(d)(a)(1) and (4). Burton alleges that he was retaliated against by Food Giant in violation of these sections. (D.E. 45-1 at PageID 542.)

The parties agree that a complainant can prevail in an FSMA action by establishing, under a preponderance of the evidence standard, the following three elements: (1) that the complainant engaged in protected activity under Section 399(d)(a); (2) that he suffered an adverse action;[1] and (3) that the protected activity was a contributing factor in the adverse action. *See* 21 U.S.C. § 399(d)(b)(2)(C).

Once a plaintiff meets this burden, the employer can still avoid liability if it proves by clear and convincing evidence that it would have taken the same adverse action in the absence of

---

[1] Because Burton was discharged, the parties do not dispute that this element has been satisfied. (D.E. 33-1 at PageID 254, n.4.)

the employee's protected conduct. *See* 21 U.S.C. § 399(d)(b)(2)(C)(ii) and (iv); *Riddle v. First Tenn. Bank, Nat. Ass'n,* 497 F. App'x 588, 596 (6th Cir. 2012) (quoting *Walton v. Nova Info. Sys.*, No. 3:06-CV-292, 2008 WL 1751525, at *7 (E.D. Tenn. Apr. 11, 2008)); *Wallender v. Canadian Nat'l Ry. Co.*, No. 2:13-CV-2603-DKV, 2015 WL 10818741, at *9 (W.D. Tenn. Feb. 10, 2015).

Burton avers that he has established all three elements and that Defendant cannot counter by clear and convincing evidence that it would have made the same decision to terminate Plaintiff. (D.E. 45-1 at PageID 545.) Defendant maintains Plaintiff's proof fails on the first and third elements of his prima facie case and that it would have still chosen to discharge Burton even if he had not reported the condensation issues. (D.E. 33-1 at PageID 255, 263.)

A.  Plaintiff's Prima Facie Case

i.  First Element: Protected Activity

The relevant part of § 399(d) states the following with regard to what constitutes protective activity:

> No entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food may discharge an employee or otherwise discriminate against an employee with respect to compensation, terms, conditions, or privileges of employment because the employee, whether at the employee's initiative or in the ordinary course of the employee's duties (or any person acting pursuant to a request of the employee)—
> (1) provided, caused to be provided, or is about to provide or cause to be provided to the employer, the Federal Government, or the attorney general of a State information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of any provision of this chapter or any order, rule, regulation, standard, or ban under this chapter, or any order, rule, regulation, standard, or ban under this chapter [sic].[2]

---

[2] The repetition is in the original statute.

9

21 U.S.C. § 399(d)(a)(1). However, that provision adds a limitation on a plaintiff's right to recover where his conduct violates the FFDCA. 21 U.S.C. § 399(d)(e). The limiting section states that:

> Subsection (a) shall not apply with respect to an employee of an entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food who, acting without direction from such entity (or such entity's agent), deliberately causes a violation of any requirement relating to any violation or alleged violation of any order, rule, regulation, standard, or ban under this chapter.
>
> 21 U.S.C. § 399(d)(e).

Food Giant contends that Burton knowingly and deliberately adulterated the meat when he refused to move the patties located under dripping condensation, and as such, his claim is barred. (D.E. 33-1 at PageID 256-57.) Defendant also avers that Plaintiff violated the FFDCA when he hit the ceiling tiles and allowed more water to drop on the meat, constituting deliberate contamination. (D.E. 33-1 at PageID 256-57.)

Plaintiff insists that he was engaged in protected activity when he hit the tiles because he was showing Hanken the scope and seriousness of the condensation issue. (D.E. 45-1 at PageID 538, 544.) Therefore, no deliberate contamination occurred. (D.E. 45-1 at PageID 538, 544.) Burton also emphasizes that "[he] unequivocally testified [at his hearing before the Appeals Tribunal of the Tennessee Department of Workforce Development] that he was unaware of any water dripping on or near uncovered meat until Mr. Hanken shined his light on the ceiling. Thus, he could not have deliberately adulterated any meat." (D.E. 45-1 at PageID 544.)

Plaintiff admits that he knew of one condensation drip falling from the ceiling in the meat department on the day of the incident. (D.E. 33-4 at PageID 304-305.) However, he claims he was unaware of other droplets falling onto raw meat in his workspace. (D.E. 33-4 at PageID 304-305)

(testifying that to his knowledge, the condensation had not dripped on the end of the table where he was working with raw meat on the morning of January 26). Having reviewed the video from the incident, the Court finds that its quality is too poor to confirm whether Plaintiff did in fact know that condensation was dripping on the meat.

Food Giant also argues that Burton failed to meet the requirements for protected activity under Section 399(d)(a) of 21 U.S.C. (D.E. 33-1 at PageID 257.) According to Defendant, the only part of Section 399(d)(a) that might apply to Plaintiff is subsection (1), but his action does not qualify because Hanken was neither a federal government employee nor an agent of the Attorney General of the State of Tennessee. (D.E. 33-1 at PageID 257.) Burton did not respond to this part of Defendant's argument. (D.E. 45.)

However, given the Court's finding on the third element, it is unnecessary to reach a conclusion on this issue.

ii.  Third Element: Contributing Factor

The "contributing factor" prong of the analysis is a matter of debate among courts who have considered the issue. Those circuits which have done so have determined that the employee must show "retaliation was *a* motivating factor." *Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 382 (7th Cir. 2018) (emphasis in original); *see also Heim v. BNSF Ry. Co.*, 849 F.3d 723, 727 (8th Cir. 2017) ("[T]o establish a prima facie case, [the plaintiff] must demonstrate that [the employer]'s discipline was, at least in part, intentional retaliation prompted by his injury report."); *Lowery v. CSX Transp., Inc.*, 690 F. App'x 98, 101 (4th Cir. 2017) (finding the "contributory factor" prong was met by proof of "retaliatory animus"). But some courts have followed the Third Circuit's holding that the plaintiff employee "*need not* demonstrate the existence of a retaliatory motive" in order to

establish that the plaintiff's disclosure was a contributing factor to the employer's termination.  *See Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 158 (3d Cir. 2013) (emphasis in original) (quoting *Marano v. Dep't of Just.*, 2 F.3d 1137, 1141 (Fed. Cir. 1993)); *see also Mosby v. Kansas City S. Ry. Co.*, No. CIV-14-472-RAW, 2015 WL 4408406, at *6 (E.D. Okla. July 20, 2015) (quoting *Araujo*, 708 F.3d at 158-59) (same); *Davis v. Union Pac. R.R. Co.*, No. 5:12-CV-2738, 2014 WL 3499228, at *8 (W.D. La. July 14, 2014) (citing *Araujo*, 708 F.3d at 158) (same).

The Sixth Circuit has not addressed this issue. *See Bostek v. Norfolk S. Ry. Co.*, No. 3:16-CV-2416, 2019 WL 2774147, at *4 (N.D. Ohio July 2, 2019) (finding that the "Sixth Circuit has yet to address whether proof of retaliatory animus is required to establish the 'contributory factor' prong."). In *Consol. Rail Corp. v. U.S. Dep't of Labor*, the Sixth Circuit quoted the Third Circuit's statement that "the contributing factor standard has been understood to mean 'any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision.'" 567 F. App'x at 338 (quoting *Araujo*, 708 F.3d at 158). But, in concluding the employee had established this prong, the Court stated there was "substantial evidence that animus was a contributing factor." *Id.* Thereafter, the Eighth Circuit cited the *Consol. Rail Corp.* conclusion in support of the statement that "the contributing factor that an employee must prove is intentional retaliation prompted by the employee engaging in protected activity." *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014) (citing *Consol. Rail Corp.*, 567 F. App'x at 338-39)).

Without a definitive ruling, several district courts within the Sixth Circuit have considered the following factors when faced with a "contributing factor" analysis:

> (i) temporal proximity; (ii) indications of pretext; (iii) inconsistent application of
> an employer's policies; (iv) shifting explanations for an employer's actions; (v)

antagonism or hostility toward a complainant's protected activity; (vi) falsity of an employer's explanation for the adverse action taken; and (v[ii] ) change in the employer's attitude toward the complainant after he engages in protected activity.

*Gibbs v. Norfolk S. Ry. Co.*, No. 3:14-cv 587, 2018 WL 1542141, at *8 (W.D. Ky. Mar. 29, 2018)

(quoting *Wagner v. Grand Trunk W. R.R.*, No. 15-10635, 2017 WL 733279, at *4 (E.D. Mich. Feb.

24, 2017)) (further citation omitted); *see also Bostek*, 2019 WL 2774147, at *4–5 (using the same

seven factors enumerated in *Gibbs*, 2018 WL 1542141, at *8); *Wallender*, 2015 WL 10818741, at

*20 (finding that the contributing factor prong can be satisfied by circumstantial evidence of

"temporal proximity, indications of pretext, inconsistent application of an employer's policies,

shifting explanations for an employer's actions, and more"); *Ma v. American Elec. Power, Inc.*,

123 F. Supp. 3d 955, 963 (W.D. Mich. Aug. 18, 2015) (considering temporal proximity, change

in attitude, and hostility toward the protected activity); *Ortiz v. Grand Trunk W. R.R. Co.*, No. 13-

13192, 2014 WL 4658762, at *7 (E.D. Mich. Sept. 17, 2014) (using the same seven factors

enumerated in *Gibbs*, 2018 WL 1542141, at *8). Here, the Court also finds these factors applicable

to the "contributing factor" inquiry.

    1.  Indications of Pretext

    The most significant question in the contributing-factor analysis is whether Plaintiff

has presented evidence of pretext on the part of Defendant. *See Gibbs*, 2018 WL 1542141,

at *9. As such, the Court will address this issue first.

    "A plaintiff can demonstrate pretext by showing that the employer's proffered

reason for the adverse action (1) has no basis in fact, (2) did not actually motivate the

defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct."

*Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 513 (6th Cir. 2016) (quoting *Jackson v.

VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 779 (6th Cir.2016)) (internal brackets

omitted). In *Braun*, the plaintiff denied committing some of the procedural violations of which she was accused and explained that her actions did not actually deviate from standard procedures or violate regulations. *Id*. at 513. The plaintiff also testified that she received conflicting explanations from her employer as to why her employment was terminated. *Id.* at 513-14. Finally, the plaintiff argued, and offered evidence, that to the extent she may have violated procedures or regulations, such violations were insufficient to warrant her dismissal because they were commonplace among male employees who were not punished. *Id.* at 514. The Sixth Circuit affirmed the district court's denial of the defendant employer's motion for a directed verdict. *Id.*

Here, there is no such evidence of any pretext. While some of the details of the August 26 incident are contested, there is no genuine dispute as to any material fact. Plaintiff admittedly raised his voice, told Hanken to "take heed," and stated this was not the last time Hanken would hear from him. (D.E. 31-1 at PageID 198; D.E. 33-4 at PageID 334; D.E. 45-2 at PageID 558, 565-55.) This incident occurred after Plaintiff told the inspector that his incompetence caused two other Food Giant employees to lose their jobs. (D.E. 45-2 at PageID 557.) Moreover, it is uncontroverted that after the inspector left the meat department, Plaintiff followed and got within a few feet of him, as well as continued to voice his frustrations with Hanken inside the Store that was open to customers. (D.E. 45-2 at PageID 558, 567.) Burton's actions made the inspector feel threatened and caused the manager of the Store to be "floored" and "in shock." (D.E. 45-2 at PageID 558.)

Therefore, when viewing the evidence in the light most favorable to Plaintiff, the Court finds that Food Giant's reason for terminating Burton is based on uncontroverted

fact. Moreover, an employee conducting himself in Plaintiff's admitted manner could be sufficient to warrant his discharge.

Burton contends that a reasonable jury could find that Food Giant and Gates were angry with him for repeatedly reporting the Store's moisture and condensation issues, along with Hanken shutting down the meat department because those occurrences caused the moisture issues to be highlighted to governmental authorities and brought about a loss of money by Food Giant. (D.E. 45-1 at PageID 545.) To support his claims, Plaintiff points to what he calls Gates' "shoddy" investigation. (D.E. 45-1 at PageID 545.) He avers that the investigation was suspect because Gates did not interview him and did not allow him to respond to the statements she gathered from other witnesses. (D.E. 45-1 at PageID 545-46.) The Court disagrees.

The Sixth Circuit has held that to avoid a finding that its claimed reason was pretextual, "the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Graham v. Best Buy Stores, L.P.*, 298 F. App'x 487, 494 (6th Cir. 2008) (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006)). An employer's investigation process need not have been ideal, but its decision on the evidence adduced must have been "reasonably informed and considered." *Id*. Therefore, Food Giant need not prove that Gates interviewed every person, but only that the employer "made its decision to terminate [Burton] based on an honestly held belief in a nondiscriminatory reason supported by particularized facts after a reasonably thorough investigation." *Id*. (quoting *Wright*, 455 F.3d at 709).

Gates questioned Hanken and obtained a copy of his report. (D.E. 45-2 at PageID 561.) In addition, she reviewed the video recording of the event. (D.E. 45-2 at PageID 561.)

She also requested and obtained written statements from Moody, Rhodes, Price, and Burton. (D.E. 33-1 at PageID 253.) Thus, Plaintiff was offered a chance to explain his side of the story in his written statement. However, as Gates explained in her meeting with Burton, he omitted important and potentially detrimental parts of the incident while presenting an account not corroborated by the other witnesses or in the video recording. (D.E. 33-12 at PageID 486-93.) Plaintiff did not mention in his statement that he told Hanken that his incompetence caused other employees to be terminated, that he followed the inspector out of the meat department, or that he told Hanken that "this is not over" and to "take heed." (D.E. 33-4 at PageID 368.) Gates' failure to personally interview Plaintiff is reasonable considering that she reviewed all other available information and that Burton's previous written statement omitted significant details. *See Graham*, 298 F. App'x at 494.

Plaintiff cites to *Humphries v. CBOCS W., Inc.,* in support of his argument that Gates' investigation was incomplete. 474 F.3d 387, 407 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008). In *Humphries*, the Seventh Circuit reversed the lower court's grant of summary judgment for defendant on the plaintiff's retaliation claim. *Id.* at 408. The Court based its conclusion on items of circumstantial evidence to support a reasonable inference that the employer's purported bad act—leaving a safe unlocked at the restaurant where he worked—was a fabrication to justify termination of the plaintiff. *Id.* at 407. One of the pieces of evidence there was the employer's inadequate investigatory efforts. *Id.* However, in that case, the facts were different from those herein. Prior to firing the plaintiff, the manager in *Humphries* tasked with investigating the complaints failed to conduct any investigation into the plaintiff's alleged misconduct. *Id.* at 390.

Burton also alleges that he did not actually violate Defendant's standards of conduct because he did not physically or verbally threaten Hanken. (D.E. 45-1 at PageID 545.) According to Plaintiff, his comments to the inspector meant that he would speak with Hanken's superiors. (D.E. 33-5 at PageID 381.) Likewise, Plaintiff argues, Gates accepted Hanken's version of events while ignoring evidence favorable to him, which reflected that the inspector was the actual aggressor. (D.E. 45-1 at PageID 545-47.)

As to his actual intention behind the "take heed" comment, Burton had opportunities to explain what he meant. However, according to the record before the Court, he did not do so until he testified in December of 2016 at his hearing before the Appeals Tribunal of the Tennessee Department of Workforce Development. (D.E. 31 at PageID 91; D.E. 31-1 at PageID 203.) Burton knew that Hanken took the employee's words as a threat as he asked Plaintiff if he was threatening him. (D.E. 45-2 at PageID 559.) Yet, Plaintiff failed to explain what he claimed he meant. (D.E. 45-2 at PageID 558) (responding to Hanken by stating "no sir I am not [threating you]; I am just telling you the truth."). Plaintiff also did not include this account in the written statement he gave to Gates a few days after the incident. (D.E. 33-4 at PageID 368.) Furthermore, in their August 31 meeting, when Gates reviewed with Plaintiff the exact words he had used and Gates indicated to Burton that this appeared to be a threat, Plaintiff provided no further clarification. (D.E. 33-12 at PageID 489-90.)

Given that Burton neither gave an explanation nor specifically denied threatening Hanken in his meeting with Gates, Food Giant's conclusion that he violated their standards of conduct was based on a "reasonable reliance on the particularized facts that were before it at the time the decision was made" to terminate Plaintiff's employment. *Graham*, 298 F. App'x at 494 (quoting *Wright*, 455 F.3d at 708) (internal quotation marks omitted). Food Giant cannot be held responsible

for not considering an account for part of Plaintiff's misbehavior when he had not proffered that version to Food Giant before making its decision. *See id*.

Next, Burton insists that Gates' testimony indicates that Price and Rhodes supported the fact that Plaintiff was not aggressive or threatening towards the inspector. (D.E. 45-1 at PageID 540) (citing D.E. 31-1 at PageID 119-120.) Plaintiff is incorrect. In the testimony cited by Plaintiff, Gates simply references Price's written statement indicating Burton answered Hanken by saying "[n]o, sir" when Hanken asked Burton if he was threatening him. (D.E. 31-1 at PageID 118.) Price's written statement does not directly address whether Burton was aggressive or threatening. (D.E. 31-2 at PageID 228.) However, it does reflect that Burton was angry during this event and responded "heatedly" to Hanken. (D.E. 31-2 at PageID 228.) Moreover, Rhodes' statement simply establishes that he did not hear Burton's answer when Hanken asked him if he was threatening the inspector. (D.E. 31-1 at PageID 118-19; D.E. 31-2 at PageID 229.)

Plaintiff also argues that Moody did not indicate that he believed Burton had threatened Hanken. (D.E. 45-1 at PageID 541.) This is simply not true. Moody testified that it was a "threating conversation" and that Burton's conduct towards Hanken "floored [him.]" (D.E. 31-1 at PageID 166, 178.) Moody also agreed with the decision to discharge Plaintiff and stated that he would want any employee terminated if that person treated someone in the manner as Burton did. (D.E. 31-1 at PageID 179.)

Plaintiff focuses part of his argument on the claim that Hanken used profanity when speaking to Moody. (D.E. 45-1 at PageID 538, 546, 563.) Even if Hanken had done so, it did not justify Burton's behavior.

For these reasons, the Court finds that Plaintiff has failed to demonstrate that Food Giant's proffered reason for terminating his employment was pretext.

18

2.   Temporal Proximity

Given that Burton reported condensation issues in the same month he was terminated, (D.E. 45-2 at PageID 552), it could be inferred that these two are related. However, "[i]t is particularly significant at the summary judgment stage that . . . . [the incident] was an intervening event that independently justified adverse disciplinary action." *Gibbs*, 2018 WL 1542141, at *8.

For example, in *Gibbs*, the plaintiff employee used a company owned truck in violation of his employer's rules. *Id*. at *2-3. The Court held that although the plaintiff was fired within a few months after engaging in protected activity, his improper use of the truck was an intervening event that formed the basis for the termination. *Id.* at *8.

Here, similar to *Gibbs*, the Court finds that Plaintiff's interaction with Hanken served as an intervening event. *See id.* Burton may not rely on temporal proximity alone to demonstrate that his protected activity was a contributing factor in Food Giant's decisions to end his employment.

3.   Inconsistent Application of an Employer's Policies

Plaintiff also argues that "a hallmark of pretext is a company's failure to follow its own policies." (D.E. 45 at PageID 546) (citing Arthur Larson, *Employment Discrimination* § 8.04 at 8-81–8-82 (rev. ed. 2015)). According to Burton, "this is exactly what occurred" when Gates "failed to follow Food Giant's progressive discipline policy" and fired him. (D.E. 45 at PageID 546-47.)

Plaintiff is correct that "the fact that an employer has failed to follow internal guidelines may be evidence that a proffered explanation is a mere pretext." *Huston v. Tennessee State Bd. of Regents*, 83 F.3d 422, *3 (6th Cir. 1996). However, Food Giant did

not do so in this instance. Rather, the Store followed its standards of conduct as they state that it "may by-pass the progressive discipline policy." (D.E. 31-2 at PageID 231.)

4.  Shifting Explanations for an Employer's Actions

Defendant has insisted that its reason for terminating Plaintiff was due to his incident with Hanken. Burton does not claim that his employer ever gave a different explanation for discharging him.

5.  Antagonism or Hostility Toward a Complainant's Protected Activity

From 2012 to 2016, Plaintiff made similar reports about condensation issues. (D.E. 33-1 at PageID 249.) However, he has not ever asserted that his disclosure of such conditions was met with any antagonism or hostility by the Store.

6.  Falsity of an Employer's Explanation for the Adverse Action Taken

In the August 31 interview, Gates explained to Burton that he was being terminated because his behavior violated SOC 8. (D.E. 33-12 at PageID 492-93.) SOC 8 specifies that employees cannot make physical threats, as well as —"[u]sing insulting, vulgar, or abusive language" or conducting themselves in a "harassing, bullying, [or] intimidating" manner. (D.E. 45-2 at PageID 551.)

Plaintiff counters that he did not actually violate these standards because he never physically or verbally threatened Hanken. (D.E. 45-1 at PageID 545.)  However, the Court must consider that Burton did not provide that explanation for his comments until eleven months after the incident occurred and following his termination. Therefore, Food Giant had not been given any evidence suggesting that Plaintiff did not threaten Hanken when it decided to terminate him.

Even if Burton did not specifically threaten Hanken, the incident did occur, and his admitted conduct warranted termination as he violated several aspects of this standard. For example, his statement to Hanken that his incompetence caused two other employees to be terminated could be considered insulting. Moreover, his aggressive demeanor and tone of voice coupled with his decision to follow Hanken out of the meat department, get within close proximity of him, and "angrily" point his finger at the inspector after Hanken asked for him to "get out of his face" could constitute harassing and intimidating conduct. For these reasons, the Court finds that Defendant did not provide a false explanation for terminating Plaintiff.

7. Change in the Employer's Attitude Toward the Complainant After He Engages in Protected Activity

Plaintiff has not alleged that Defendant's attitude toward him modified when he reported the issues in the meat department over several years. Moreover, there is no evidence in the record of such a change.

In summary, in viewing the record in the light most favorable to Plaintiff, the Court finds that there is no genuine dispute as to any material fact. Moreover, there are no issues for trial as the record establishes that Burton's complaints were not a contributing factor in Food Giant's decision to terminate his employment. The Court finds that Gates considered the events that occurred on January 26 based on the information available to her at the time and determined that Plaintiff had violated Food Giant's standards of conduct.

21

### III.    CONCLUSION

Based on the foregoing, the Defendant's motion for summary judgment (D.E. 33) is

**GRANTED** and  Plaintiff's claims are therefore **DISMISSED**.

IT IS SO ORDERED this 12th day of August 2021.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE
